## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                                               Case No.  05-32536

ROBERT H. BABB, SR.

                    Debtor

      SANDRA AYERS

                    Plaintiff

          v.                                        Adv. Proc. No.  05-3163

      ROBERT H. BABB, SR.

                    Defendant

## <u>M E M O R A N D U M</u>

**APPEARANCES:**    WADE M. BOSWELL, ESQ.
                    Post Office Box 221
                    Knoxville, Tennessee  37901
                    Attorney for Plaintiff

                    MOSTOLLER, STULBERG & WHITFIELD
                    Ann Mostoller, Esq.
                    136 South Illinois Avenue
                    Suite 104
                    Oak Ridge, Tennessee  37830
                    Attorneys for Defendant/Debtor

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint filed by the Plaintiff, Sandra Ayers, on October 14, 2005, objecting to the discharge of the Defendant/Debtor under 11 U.S.C.A. § 727(a)(2), (3), and/or (4) (West 2004), or in the alternative, seeking a determination of the nondischargeability of a debt under 11 U.S.C.A. § 523(a)(2)(A) and/or (6) (West 2004).

The trial was held on December 5, 2006. The record before the court consists of thirty-seven exhibits introduced into evidence, along with the testimony of three witnesses, the Debtor, Steven Jeffers, and the Plaintiff.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(I) and (J) (West 2006).

## I

On September 21, 1994, the General Sessions Court for Campbell County, Tennessee, (General Sessions Court) entered a Final Decree, granting the Plaintiff a divorce from the Debtor's son, Bruce A. Babb (Bruce Babb). TRIAL EX. 4. The Final Decree approved the terms of the parties' Marital Dissolution Agreement dated July 15, 1994, and an Amendment to Marital Dissolution Agreement dated September 21, 1994 (collectively, Marital Dissolution Agreement). TRIAL EX. 2; TRIAL EX. 3. Pursuant to the Marital Dissolution Agreement, the Plaintiff and Bruce Babb agreed to sell two parcels of real property located on Old Brimstone Road[1] in Huntsville, Tennessee, comprising their marital residence (Marital Residence) and a rental house (Rental Property), and to use the proceeds to pay off joint debts with any remaining proceeds to be divided equally.

---

[1] The Marital Dissolution Agreement refers to the properties as being located on Old Brimstone Road, while deeds introduced into evidence identify the properties as located on the Old Montgomery Road. The proof at trial evidences that the properties in question are located on what is now known as Hickory Mill Road.

2

Following the divorce, the Plaintiff and Bruce Babb conveyed both the Marital Residence and Rental Property to the Defendant.[2]

On November 5, 1995, the Plaintiff filed a Petition for Contempt and Petition for Enforcement of Divorce Decree and Complaint (Contempt Complaint) in the General Sessions Court against Bruce Babb and the Debtor, averring the following concerning both the Marital Residence and the Rental Property:

> 2.   Plaintiff would aver that pursuant to Item 6 of the Marital Dissolution Agreement the parties were to sell in a commercially reasonable manner their home and three acres on Old Brimstone Rd. in Huntsville, Tennessee, payoff its debt, and pay the equity on joint marital obligations or divide same.  Plaintiff would aver that on October 4, 1994 she joined in a quitclaim deed with her ex-husband Bruce Babb and transferred the subject property to Robert H. Babb, defendant's father, for the purposes of closing the same in a commercially reasonable manner.  Plaintiff would aver the said Robert H. Babb has held said property, in trust for the benefit of Sandra A. Babb heirs and Bruce A. Babb since said transfer and not reasonably and commercially disposed of the property.  Plaintiff avers that said property under the direction of this Court should be sold and the directives of the Court as approved in the Marital Dissolution Agreement followed.

> 3.   Plaintiff avers that the parties agreed to sell in a commercially reasonable manner a rental home on one acre, on Old Brimstone Rd. in Huntsville, Tennessee and pay off its debt, and pay the equity on the joint marital obligations or divide same.   Plaintiff avers that said property was transferred by quitclaim deed to Robert H. Babb in trust to carry out the sale in a commercially reasonable manner.  Plaintiff avers that said property has not been disposed of by Robert H. Babb, and same should be disposed of pursuant to the Marital Dissolution Agreement hereinbefore entered into between the parties.

---

[2] Although the Debtor testified that both parcels were transferred to him following the divorce, the only deed introduced into the record is a Quit Claim Deed establishing that the Plaintiff and Bruce Babb conveyed the Rental Property to the Debtor on October 4, 1994.  No deed was admitted into evidence establishing the date the Marital Residence was transferred to the Debtor.  However, Trial Exhibit 9, a Quit Claim Deed dated February 29, 2000, where the Debtor reconveyed the Marital Residence to Bruce Babb, recites that the Marital Residence was "conveyed to Robert H. Babb from Bruce Allen Babb and wife, Sandra Rose Babb via Quit Claim Deed dated September 9, 1994," a date prior to the divorce.

TRIAL EX. 7 at ¶¶ 2, 3.

On February 29, 2000, the Debtor executed a Quit Claim Deed transferring the Marital Residence back to Bruce Babb. *See* TRIAL EX. 9. Thereafter, on December 26, 2001, Bruce Babb and his current spouse, Holly, transferred the Marital Residence to Jake M. Terry, Sr. *See* TRIAL EX. 10. None of the proceeds from this sale were paid to the Plaintiff. In a Memorandum Opinion dated January 31, 2002, the General Sessions Court determined that the "terms of the MDA should be specifically enforced and the proceeds divided equally between the original parties subject to the outstanding indebtedness[.]" TRIAL EX. 11. The Plaintiff was awarded a judgment against Bruce Babb and the Debtor in the amount of $124,654.00 by the General Sessions Court on September 19, 2003, supported by Findings of Fact, stating that "[t]he value of the marital assets and rent due Sandra Ayers ranges between $124,556.00 and $135,245.00[.]" TRIAL EX. 14; TRIAL EX. 15 at ¶ 3. Taking a value of $129,405.11 for the Marital Residence and rental income for the Rental Property, less all marital bills paid by Bruce Babb, the court awarded the Plaintiff the $124,654.00 judgment. TRIAL EX. 15 at ¶ 13. Writs of Execution in collection of the judgment were issued on September 24, 2004, to First National Bank of Oneida and McCreary National Bank. TRIAL EX. 16; TRIAL EX. 17. The Plaintiff recovered some funds from an execution on the Debtor's bank accounts, after which the Debtor testified that he removed his name from all accounts.

The Debtor filed the Voluntary Petition commencing his Chapter 7 bankruptcy case on May 5, 2005. He listed the September 19, 2003 judgment owed to the Plaintiff as an unsecured debt in the amount of $136,231.11 in his statements and schedules. *See* COLL. TRIAL EX. 22; COLL. TRIAL EX. 23. The Plaintiff filed the Complaint initiating this adversary proceeding on October 14,

2005, averring that the Debtor, with the intent to hinder and defraud his creditors, did not fully disclose property of the estate; that he has concealed and failed to produce records, books, and documents; and that he knowingly and fraudulently made false statements in his bankruptcy statements and schedules, all of which justify a denial of his discharge.  Alternatively, the Plaintiff alleges that the Debtor knowingly, intentionally, and fraudulently accepted the quit claim deed from Bruce Babb in order to deceive her, and that by placing mortgages on the properties and deeding the Marital Residence back to Bruce Babb, the Debtor has intentionally, willfully, and maliciously converted her properties for his own use.

## II

Chapter 7 debtors receive a general discharge of all pre-petition debts under 11 U.S.C.A. § 727, unless one of ten express limitations exists.[3]  As material to this adversary proceeding, § 727 provides:

(a)  The court shall grant the debtor a discharge, unless—

. . . .

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

---

[3]  The Chapter 7 discharge relieves "honest but unfortunate" debtors of their debts and allows them a "fresh start" through this discharge.  *Buckeye Retirement, LLC v. Heil (In re Heil),* 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn,* 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt,* 54 S. Ct. 695, 699 (1934))). "Except as provided in section 523 . . ., a discharge under subsection (a) . . . discharges the debtor from all debts that arose before the date of the order for relief under this chapter[.]"  11 U.S.C.A. § 727(b) (West 2004).

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case [or];

(4) the debtor knowing and fraudulently, in or in connection with the case—

(A) made a false oath or account[.]

11 U.S.C.A. § 727(a).  These limitations provide creditors with "a vehicle under which *abusive debtor conduct can be dealt with by denial of discharge.*" *Blockman v. Becker (In re Becker)*, 74 B.R. 233, 236 (Bankr. E.D. Tenn. 1987) (quoting *Harman v. Brown* (*In re Brown*), 56 B.R. 63, 66 (Bankr. D.N.H. 1985)).  Section 727(a) is liberally construed in favor of the debtor, and the party objecting to discharge bears the burden of proof by a preponderance of the evidence.  *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683 (6th Cir. 2000); *Barclays/Am. Bus. Credit, Inc. v. Adams (In re Adams)*, 31 F.3d 389, 393 (6th Cir. 1994); FED. R. BANKR. P. 4005.

## A

The Plaintiff first objects to the Debtor's discharge under § 727(a)(2)(A), which consists of two elements:  (1) the disposition of property, including transfer or concealment, within one year of the filing of the bankruptcy petition, and (2) the debtor's subjective intent to hinder, delay, or defraud creditors by disposing of his property.  *Keeney*, 227 F.3d at 683-84 (citing *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)); *see also Cuervo v. Snell (In re Snell)*, 240 B.R. 728, 730 (Bankr. S.D. Ohio 1999) (stating that a plaintiff need not prove the debtor intended to hinder, delay, and defraud creditors, since proof of any one satisfies § 727(a)(2)(A)).  Proof of actual fraud

6

is required; constructive fraud will not suffice. *E. Diversified Distrib., Inc. v. Matus (In re Matus)*,

303 B.R. 660, 672 (Bankr. N.D. Ga. 2004). Therefore, in order to prevail under this subsection, a

plaintiff must prove that the debtor possessed an actual intent to deceive; however, because of the

inherent difficulties in proving intent, circumstantial evidence, including evidence of the debtor's

conduct, may be used to establish his intent. *Buckeye Retirement Co., L.L.C. v. Heil (In re Heil)*, 289

B.R. 897, 907 (Bankr. E.D. Tenn. 2003). Any harm suffered by the Plaintiff is irrelevant for the

purposes of § 727(a)(2)(A). *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882,

894 (Bankr. N.D. Ill. 2003) (citing *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 968 (7th Cir. 1999)).

     In order to determine actual intent, based upon circumstantial evidence, many courts consider

the following "badges of fraud":

> (i) the lack of adequate consideration for the transfer; (ii) the family, friendship, or
> close relationship between the parties; (iii) the retention of possession, benefit, or use
> of the property in question by the debtor; (iv) the financial condition of the party
> sought to be charged prior to and after the transaction in question; (v) the conveyance
> of all of the debtor's property; (vi) the secrecy of the conveyance; (vii) the existence
> or cumulative effect of a pattern or series of transactions or course of conduct after
> incurring of debt, onset of financial difficulties, or pendency or threat of suit by
> creditors; and (viii) the general chronology of events and transactions under inquiry.

*Matus*, 303 B.R. at 672-73; *see also Stevenson v. Cutler (In re Cutler)*, 291 B.R. 718, 723 (Bankr.

E.D. Mich. 2003). Additional factors indicating a debtor's actual intent include

> whether the transaction is conducted at arm's length; whether the debtor is aware of
> the existence of a significant judgment or over-due debt; whether a creditor is in hot
> pursuit of its judgment or claim and whether the debtor knows this; and the timing
> of the transfer relative to the filing of the petition.

*Adamson v. Bernier (In re Bernier)*, 282 B.R. 773, 781 (Bankr. D. Del. 2002). If the Plaintiff

establishes the existence of badges of fraud, the burden shifts to the Debtor to rebut the presumption.

7

*Village of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002); *see also Nashville City Bank & Trust Co. v. Peery (In re Peery)*, 40 B.R. 811, 815 n.6 (Bankr. M.D. Tenn. 1984).  Moreover "[j]ust one wrongful act may be sufficient to show actual intent . . . [although] a continuing pattern of wrongful behavior is a stronger indication [thereof]."  *Hunter v. Sowers (In re Sowers)*, 229 B.R. 151, 157 (Bankr. N.D. Ohio 1998).

With respect to this subsection, the Plaintiff presented evidence of three instances that she contends falls within the scope of § 727(a)(2)(A).  First, the Plaintiff argues that the Debtor owns the Rental Property, but he allows Bruce Babb to collect the rents.  Next, the Plaintiff argues that after she filed Writs of Execution seeking to collect on the judgment, the Debtor closed all of his bank accounts and authorized his wife to open a new account under the name "B & W Gas Station," and that the Debtor concealed all of the money he made operating the service station in order to hinder her collection efforts.  Finally, the Plaintiff argues that the Debtor renewed a note to First National Bank of Oneida, secured by the Rental Property, within the one year preceding his bankruptcy case.

The Debtor testified that he has never had an intent to defraud creditors with respect to any of his actions.  Although the Debtor acknowledged that he removed his name from his bank accounts, including the checking account for his business, a service station known as Babb's 66, after the Plaintiff successfully executed upon it, he testified that he did so because he could not operate the business without operating funds, and those funds could not be subject to execution by the Plaintiff.  As for his failure to collect rents from Bruce Babb on the Rental Property, the Debtor testified that he was only trying to assist his son.  Finally, with respect to the renewal note to First

8

National Bank of Oneida, the Debtor testified that he never read documents that he was asked to sign at First National Bank, that he simply relied upon bank personnel to look out for his interests, and that he just signed any documents they requested.

With respect to the Rental Property, the Debtor testified that he is the owner of this property, but he does not make payments on it.  In addition, the Debtor testified that although he has the right to collect rents, he does not, and in fact, that Bruce Babb has never paid him any of the rental money from the Rental Property, either before and after he filed for bankruptcy.  The Plaintiff challenged this testimony through the contradictory testimony given by the Debtor at his June 22, 2005 deposition wherein he stated that when Bruce Babb rented the Rental Property, he paid the money to the Debtor.  Given the Debtor's propensity, as hereinafter discussed, to take whatever steps are necessary to avoid execution by the Plaintiff on her judgment, the court finds the Debtor's diversion of his rental income to Bruce Babb to be just another vehicle designed to defeat the Plaintiff's claim.  Thus, this action rises to the level of fraudulent behavior necessary to support a denial of his discharge under § 727(a)(2).

The same can also be said with respect to the Debtor's actions concerning his bank accounts.  In his Statement of Financial Affairs, the Debtor lists three bank accounts, all of which he states were closed in October 2004, admittedly after the Plaintiff successfully executed upon the judgment.  He and his wife, Wilma, then opened bank accounts in her name or with her as the only signatory, with the acknowledged intent of thwarting the Plaintiff's efforts to collect the judgment through execution.  Based upon the evidence presented, the court finds that the Plaintiff has met her burden

9

of proof with respect to the Debtor's concealment of property in order to hinder her attempts to collect upon the judgment, which justifies denial of his discharge under § 727(a)(2)(A).

The court cannot, however, find anything fraudulent about the Debtor's renewal of a note to First National Bank of Oneida in the amount of $18,500.15, which was secured by the Rental Property. In fact, the evidence shows that the Debtor first encumbered the Rental Property with a note in the amount of $6,540.22 on October 4, 1994, and this note was consistently renewed each year between 1995 and 2000. The June 3, 2004 renewal note appears to renew a consolidation of the Debtor's obligations to First National Bank of Oneida that are secured by the Rental Property. *See* COLL. TRIAL EX. 6.

**B**

The Plaintiff also objects to the Debtor's discharge under § 727(a)(2)(B). Whereas § 727(a)(2)(A) encompasses the Debtor's pre-petition acts, his post-petition actions fall within the scope of § 727(a)(2)(B), which requires proof that "the Debtor (1) transferred, removed, destroyed, mutilated, or concealed property of his bankruptcy estate, (2) with actual intent to hinder, delay, or defraud a creditor or an officer of the estate, (3) after the Petition Date." *Harker v. West (In re West)*, 328 B.R. 736, 752 (Bankr. S.D. Ohio 2004). "The intent of [§] 727(a)(2)(B) is to deny discharge to a debtor who fails to disclose transactions regarding his assets subsequent to filing his petition in bankruptcy." *Sicherman v. Rivera (In re Rivera)*, 338 B.R. 318, 328 (Bankr. N.D. Ohio 2006) (quoting *Govaert v. S. Nat'l Bank of N.C. (In re Caserta)*, 182 B.R. 599, 606 (Bankr. S.D. Fla. 1995)). Once a creditor establishes its case, the burden shifts to the debtor to provide the court with

a convincing explanation for the concealment. *Royer v. Smith (In re Smith)*, 278 B.R. 253, 257

(Bankr. M.D. Ga. 2001). As with § 727(a)(2)(A), the Plaintiff may establish the Debtor's intent

under § 727(a)(2)(B) through evidence of his conduct. *Sowers*, 229 B.R. at 157.

With respect to this subsection, the wrongful actions alleged by the Plaintiff concerning the

Debtor's post-petition conduct relate to his receipt of proceeds from the operation of Babb's 66

service station located at 18818 Alberta Avenue, Oneida, Tennessee, and the subsequent sale of the

Debtor's interest therein in December 2005, during the pendency of his bankruptcy case.

The Debtor acquired his interest in the Babb's 66 service station under the terms of an

undated Sale Agreement executed by Steve Jeffers and Glenn Burke, as Sellers, which provides in

its entirety:

SALE AGREEMENT

This AGREEMENT is between Bobby Babb hereinafter referred to as Buyer and Steve Jeffers and Glenn Burke hereinafter referred to as Sellers.

Sellers agree to sell to Buyer[ ]the Phillips 66 Service Station located at 18818 Alberta Ave[.], Oneida, TN for the purchase price of $110,000 (one hundred ten thousand dollars) to be paid by Seller with a down payment of $20,000 (twenty thousand dollars) and the balance to be paid at $1100.00[ ](one thousand one hundred dollars) per month at 7% interest beginning on April 22nd, 2003. Seller also agrees to give Buyer a $10,000 discount if Buyer pays balance in full on or before April 1st,[ ]2004.

Furthermore upon the death of Buyer this Agreement shall by [sic] passed to Buyer's wife Wilma Babb with no additional cost to anyone.

TRIAL EX. 40. The Sale Agreement is undated and is signed by the Sellers, but is not signed by the

Debtor. It is undisputed that it was executed prior to the commencement of the Debtor's bankruptcy

11

case on May 5, 2005, and, by its terms, the court can deduce that it was executed prior to April 22,

2003, the date the Debtor was to make the first installment payment.

At the time of the execution of the Sale Agreement, the Debtor paid the Sellers the required

$20,000.00 down payment and began making the required monthly payments of $1,100.00, which

he consistently made through November 2005.  On December 29, 2005, almost seven months after

the Debtor commenced his bankruptcy case, the Babb's 66 service station was sold for $125,000.00.[4]

From the proceeds of this sale, the Debtor received $53,328.49, representing the approximate

difference between the sale price and the balance owing Mr. Jeffers and Mr. Burke under the terms

of the Sale Agreement.  *See* TRIAL EX. 49.  Neither the Debtor's interest in the Babb's 66 service

station acquired pursuant to the Sale Agreement, nor the $53,328.49 he realized from its sale was

disclosed pre-petition or post-petition by the Debtor.  The court has no difficulty in finding that the

Debtor concealed his interest in the Babb's 66 service station both pre-petition and post-petition and

concealed his receipt of the post-petition sale proceeds both with the actual intent to hinder, delay,

or defraud a creditor, namely the Plaintiff, or an officer of the court after the petition date.  The

elements of § 727(a)(2)(B) have been satisfied, and the Debtor will be denied his discharge under

this section.

---

[4] The General Warranty Deed evidencing the sale was executed by Glen S. Jeffers, as Grantor.  Although the
record is unclear on this point, the court presumes that no deed was ever executed conveying the Babb's 66 service
station property into the name of the Debtor and that Glen S. Jeffers was the record title owner of the property.

## C

The Plaintiff has also objected to the Debtor's discharge under § 727(a)(3) for failing to produce documentation "with enough information to ascertain [his] financial condition and track [his] financial dealings with substantial accuracy for a reasonable period past to present." *Wazeter v. Mich. Nat'l Bank (In re Wazeter)*, 209 B.R. 222, 227 (W.D. Mich. 1997) (quoting *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (citations omitted)).  This disclosure provides the trustee and creditors with sufficient information concerning the Debtor's financial history and current financial affairs, because "[c]reditors are not required to risk having the debtor withhold or conceal assets 'under the cover of a chaotic or incomplete set of books or records.'"  *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992) (quoting *Cox v. Lansdowne (In re Cox)*, 904 F.2d 1399, 1401 (9th Cir. 1990)).

Although the Plaintiff is not required to investigate and acquire the Debtor's records, as it is the Debtor's responsibility to provide sufficient information, *see Wazeter*, 209 B.R. at 227-28, the Plaintiff does bear the initial burden of proof under § 727(a)(3) that the Debtor "has failed to maintain adequate books and records and that such failure renders it impossible to discern [his] true financial condition[.]"  *Christy v. Kowalski (In re Kowalski)*, 316 B.R. 596, 601 (Bankr. E.D.N.Y. 2004).  If the Plaintiff proves that the Debtor's records are inadequate, the burden shifts to the Debtor to prove that his failure to maintain records was justified under the specific circumstances of his case, *Turoczy Bonding Co. v. Strbac (In re Strbac)*, 235 B.R. 880, 883 (B.A.P. 6th Cir. 1999).  Intent is not an element under § 727(a)(3).  *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002).

13

The adequacy of a debtor's records is determined on a case by case basis, *Strbac*, 235 B.R. at 882, and judges have broad discretion to deny discharge based on inadequately kept books and records. *Dolin v. N. Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986).

> The Bankruptcy Code does not require a debtor seeking a discharge specifically to maintain a bank account, nor does it require an impeccable system of bookkeeping. Nevertheless, the records must "'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.' The test is whether 'there [is] available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.'"

*Alten*, 958 F.2d at 1230 (quoting *In re Decker*, 595 F.2d 185, 187 (3d Cir. 1979) (citations omitted)). Instead, the Debtor's records should be measured "against the type of books and records kept by a reasonably prudent debtor with the same occupation, financial structure, education, and experience." *Wazeter*, 209 B.R. at 227 (quoting *Wynn v. Wynn (In re Wynn)*, 205 B.R. 97, 101 (Bankr. N.D. Ohio 1997)). Factors focused on by the courts include:

> (1) whether the debtor was engaged in business, and if so, the complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the debtor's education, business experience and sophistication; (5) the customary business practices for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor.

*Kowalski*, 316 B.R. at 602 (citing *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993)). Examples of inadequate disclosures include the failure to produce checking account statements, tax returns, household bills and/or credit card records, loan documentation, pay records, and real estate closing statements. *See Ochs v. Nemes (In re Nemes)*, 323 B.R. 316, 325 (Bankr. E.D.N.Y. 2005) (credit card records and bank statements); *Strbac*, 235 B.R. at 884 (tax

14

returns, paycheck stubs, and records with respect to the debtor's subcontractor work); *Wazeter*, 209 B.R. at 228 (cancelled checks for two years, loan records, closing records for real estate transactions, and household bills).

The Plaintiff argued that the Debtor's failure to keep separate bank records for Babb's 66 and a second service station known as Babb's Exxon (Babb's Exxon) and his own personal and business financial dealings constitutes the basis for a denial of discharge under § 727(a)(3); however, the only evidence introduced into the record with respect to this objection was the Debtor's testimony that his wife wrote checks out of the same account for both service stations. The Plaintiff did not offer any records concerning the Debtor's bank accounts, or lack thereof, into evidence, such as would allow the court to assess whether the books and records were so deficient that the Debtor's true financial circumstances could not be ascertained. As such, the Plaintiff did not meet the initial burden of proof required by § 727(a)(3), so the burden does not shift to the Debtor to prove that his records are, in fact, adequate, and he will not be denied his discharge under § 727(a)(3).

### D

Finally, the Plaintiff argues that, under § 727(a)(4)(A), the Debtor is not entitled to discharge. To satisfy this subsection, the Plaintiff must prove: (1) the Debtor made a statement under oath; (2) that was false; (3) he knew that the statement was false when he made it; (4) he fraudulently intended to make the statement; and (5) the statement materially related to the bankruptcy case. 11 U.S.C.A. § 727(a)(4)(A); *Keeney*, 227 F.3d at 685; *Hendon v. Oody (In re Oody)*, 249 B.R. 482, 487 (Bankr. E.D. Tenn. 2000). Section 727(a)(4)(A) includes both affirmative false statements and omissions.

15

*Searles v. Riley (In re Searles)*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004). Furthermore, statements are material for the purposes of § 727(a)(4) if they "bear[] a relationship to the [debtor's] business transactions or estate, or concern[] the discovery of assets, business dealings, or the existence and disposition of property." *Keeney*, 227 F.3d at 686 (quoting *Beaubouef v. Beaubouef* (*In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992)).

A debtor's statements and schedules are executed under penalty of perjury. FED. R. BANKR. P. 1008; OFFICIAL FORM 1 (Voluntary Petition); OFFICIAL FORM 7 (Statement of Financial Affairs); *Hamo v. Wilson (In re Hamo)*, 233 B.R. 718, 725 (B.A.P. 6th Cir. 1999). Statements made by the Debtor at his meeting of creditors pursuant to 11 U.S.C.A. § 341 (West 2004) were made under oath. *See* 11 U.S.C.A. § 343 (West 2004) ("The debtor shall appear and submit to examination under oath at the meeting of creditors under section 341(a) of this title. . . ."); FED. R. BANKR. P. 2003(c). Similarly, testimony and statements given in a deposition or 2004 examination are under oath. *See, e.g., Brumley v. Wingard*, 269 F.3d 629, 642 (6th Cir. 2001).

Knowledge that a statement is false can be evidenced by a demonstration that the debtor "knew the truth, but nonetheless failed to give the information or gave contradictory information." *Hamo*, 233 B.R. at 725; *Sowers*, 229 B.R. at 158 (citing *Pigott v. Cline (In re Cline)*, 48 B.R. 581, 584 (Bankr. E.D. Tenn. 1985)). Fraudulent intent "involves a material representation that [the debtor knows] to be false, or . . . an omission that [the debtor knows] will create an erroneous impression." *Keeney*, 227 F.3d at 685 (quoting *In re Chavin*, 150 F.3d 726, 728 (7th Cir. 1998)). Reckless disregard or indifference for the truth also demonstrates fraudulent intent. *Keeney*, 227 F.3d at 686; *Beaubouef*, 966 F.2d at 178. Likewise, intent may be inferred from the Debtor's conduct, and a

16

continuing pattern of omissions and/or false statements in his bankruptcy schedules exhibits reckless indifference. *Hamo*, 233 B.R. at 724-25; *Sowers*, 229 B.R. at 159.

On the other hand, courts do not generally find that debtors who mistakenly or inadvertently give false information, and those who amend their schedules and report omissions or misstatements prior to or during their meetings of creditors possess the requisite fraudulent intent for denial of their discharge under § 727(a)(4)(A). *Keeney*, 227 F.3d at 686; *Gold v. Guttman (In re Guttman)*, 237 B.R. 643, 647 (Bankr. E.D. Mich. 1999). "Often, the intent issue will turn on the credibility and demeanor of the debtor[.]" *LaRocco v. Smithers (In re Smithers)*, 2006 Bankr. LEXIS 265, at *9 (B.A.P. 6th Cir. Mar. 2, 2006) (quoting *Groman v. Watman (In re Watman)*, 301 F.3d 3, 8 (1st Cir. 2002)).

> [S]ince interested parties should not be required to drag the truth from the debtor, a showing of good faith in a § 727(a)(4)(A) matter will often come down to whether a debtor has abided by this cardinal rule: when in doubt, disclose. For example, a debtor is likely to be forgiven for simply mislabeling an asset, where its existence is still initially disclosed. However, where a debtor only voluntarily discloses information after its existence is uncovered by a third-party (e.g., a trustee or creditor), good faith is unlikely to be found.

*United States Tr. v. Halishak (In re Halishak)*, 337 B.R. 620, 630 (Bankr. N.D. Ohio 2005) (internal citations omitted).

The Plaintiff's averments concern omissions and misstatements contained in the Debtor's statements and schedules. In support of her contention that the Debtor should be denied a discharge pursuant to § 727(a)(4)(A), the Plaintiff argues that the Debtor made false and misleading disclosures in his statements and schedules by (1) not listing payments made to creditors within 90 days of filing; (2) failing to disclose property being held and controlled by others; (3) not listing any accounts

receivable as personal property; (4) not listing all real and personal property in which he shares an ownership interest; (5) not stating the type of ownership interest he held in the service stations; (6) failing to list Bruce Babb as a co-debtor on debts; (7) failing to list an outstanding contract for the sale of the service station; and (8) listing taxable income rather than actual income on his Schedule J.

First, the Plaintiff contends that the Debtor failed to list on his Statement of Financial Affairs payments made to many creditors within 90 days of filing. In support of this argument, the Plaintiff introduced the following lists of payments made by the Debtor to vendors on behalf of Babb's 66 between February 4, 2005, and May 5, 2005: (1) to Hoskins Oil Company totaling $101,409.57; (2) to H.T. Hackney totaling $19,000.30; (3) to Household Credit totaling $1,005.17; (4) to BB&T totaling $1,328.19; and (5) to Steve Jeffers totaling $3,300.00. TRIAL EX. 43; TRIAL EX. 44; TRIAL EX. 45; TRIAL EX. 46. By way of explanation, the Debtor, while not disputing the undisclosed payments, testified that they were for petroleum and inventory for Babb's 66, not for him personally, and that he did not write any of the checks since his wife paid all of the bills. Clearly, these transactions were substantial and their disclosure by the Debtor was required.

Next, the Plaintiff contends that the Debtor failed to list various property in his schedules in which he holds an ownership interest, such as (1) cash and accounts receivable for Babb's 66; (2) real property owned jointly with Bruce Babb and his current spouse; (3) household furnishings purchased for the trailer in which the Debtor and his wife reside; (4) vehicles owned jointly with Patriot Transfer, LLC; and (5) inventory attributable to the operation of Babb's 66 and Babb's Exxon.

18

The Debtor listed three parcels of real property on his Schedule A:  two parcels located on Ross Lane in Winfield, Tennessee, owned as tenants-by-the-entireties with his wife, and the Rental Property owned in fee simple.  In Schedule B, the Debtor listed that he held $0.00 in cash on hand and in accounts receivable, that he only had household furnishings valued at $90.00 consisting of a recliner, a television, and a lawnmower, and that all other household furnishings belonged to his wife, that he held $0.00 interest in inventory, and that he held an ownership interest in three vehicles, a 2003 Ford F150, along with a 2000 Ford F350 and a 2001 Dodge 3500 owned jointly with Bruce Babb.

At trial, the Debtor acknowledged that he did not originally list in his schedules a parcel of rental property that he co-owns with Bruce Babb and his current spouse.  On June 6, 2006, he filed an Amended Schedule A listing this property located at Sulfur Creek Road, held as tenants in common with Bruce and Holly Babb, subject to a secured claim of $100,000.00 and having an unknown current market value.  COLL. TRIAL EX. 24.

The Debtor also acknowledged that although he listed no cash on hand or inventory in Schedule B, Babb's 66 had between $200.00 and $300.00 cash on hand each morning, including the morning he filed for bankruptcy, that it took cash, checks, and credit cards as payment for its goods, and that he maintained adequate inventory for the business at all times.  He also acknowledged that when he and his wife purchased the doublewide trailer in which they reside, it had no furniture or appliances.  He testified that they did not buy new furniture, but instead, just used what his wife had; however, this testimony contradicts statements made by the Debtor during a deposition on June 22,

19

2005, in which the Debtor testified that he and his wife bought appliances for the trailer jointly. With respect to the business funds and inventory, the Debtor testified that he did not anticipate that items for his business such as inventory and supplies would be considered in his personal bankruptcy. He filed an Amended Schedule B on June 6, 2006, changing the notation with respect to his automobiles to owning the 2000 Ford F350 and the 2001 Dodge 3500 jointly with Patriot Transport, LLC, rather than Bruce Babb individually. COLL. TRIAL EX. 24. The Debtor made no other amendments concerning his personal property.

The Plaintiff also contends that the Debtor's failure to disclose the Sale Agreement and his ownership interest in Babb's 66 in Schedule A to his Voluntary Petition constitutes a material omission. The Debtor did not list any reference to money owed under the Sale Agreement on Babb's 66 in either Schedule D or Schedule G to his Voluntary Petition, nor did he disclose the monthly payments he was making under the Sale Agreement at paragraph 3 on his Statement of Financial Affairs. At trial, the Debtor testified that he was unclear just what interest he held, and that he did not think he actually owned the Babb's 66 service station when he filed his bankruptcy case. Nevertheless, on June 6, 2006, the Debtor filed an Amended Schedule G stating that he held a lease agreement with "Babb's 66 gas station," but did not name the other party to the "lease." COLL. TRIAL EX. 24. This statement was patently false because the Debtor's interest in Babb's 66 service station was sold in December 2005, at which time the Debtor received $53,328.49. This transaction has never been disclosed by the Debtor.

The Debtor testified that he was unaware that the Sale Agreement actually constituted a sale of the service station to him, and that it was his understanding that Mr. Jeffers and Mr. Burke could

force him to vacate the premises at any time, even if he was making timely payments.  He argued that he tried to get financing through a bank, but he was unable to get it, so he entered into the agreement to pay Mr. Jeffers.  The Debtor also contended that because there were no documents "on the record," it was his belief that Mr. Jeffers and Mr. Burke were not bound by the Sale Agreement.  However, the Debtor's testimony was refuted by that of Mr. Jeffers, who testified that the Sale Agreement was an owner-financed agreement for the purchase of the service station, that the Debtor was provided with the Amortization Schedule, entered into evidence as Trial Exhibit 50, and that he never told the Debtor that he or Mr. Burke could take the property back from the Debtor as long as he was making payments.  Mr. Jeffers' testimony, which directly contradicts that of the Debtor, was further substantiated by the Debtor's deposition testimony on October 31, 2006, wherein the Debtor stated that he thought that the Sale Agreement constituted a lease with an option to buy, that he got the Amortization Schedule within a week of execution of the Agreement, and when asked if he would own the property if he made all payments, the Debtor answered that he would.

Most significantly, the Debtor's testimony that he did not think he held an ownership interest in the service station is rebutted by his own actions following its sale to Jerry Slaven in December 2005.  The Debtor testified that he made monthly payments to Mr. Jeffers of $1,100.00 pursuant to the Amortization Schedule each month from April 2003 through November 2005.  The Debtor stopped making payments at that point due to the sale of the service station to Mr. Slaven, from which the Debtor received $53,328.49, representing his interest in the station after Mr. Jeffers was paid the balance of the $110,000.00 and taxes.  The court is satisfied that the Debtor was aware

21

of the true nature of his agreement with Mr. Jeffers and Mr. Burke.  The court finds that the Debtor's claim that he was unaware of the true nature of his ownership interest in Babb's 66 to be disingenuous and not credible.

As for the income issues, the Plaintiff contends that the Debtor did not report income received from his operation of Babb's Exxon.  The Debtor's Statement of Financial Affairs reflects income from self-employment for 2003 and 2004 of $59,900.00 and $59,000.00, respectively.  To challenge these figures, the Plaintiff offered into evidence the Debtor's tax returns for 2003 and 2004.  *See* TRIAL EX. 38; TRIAL EX. 39.  The Debtor's 2003 tax return, filed jointly with his wife, evidences that the gross profit for Babb's 66 in 2003, based on gross receipts of $549,520.00, was $59,990.00, and that the gross profit for Babb's Exxon, based on gross receipts of $190,413.00, was $17,746.00.  TRIAL EX. 38.  The Debtor's 2004 tax return, also filed jointly with his wife, evidences that Babb's 66 had gross receipts in 2004 of $532,291.00 and a gross profit of $69,206.00, and Babb's Exxon had gross receipts of $128,927.00 and a gross profit of $9,769.00.  TRIAL EX. 39.  In his defense, the Debtor testified that he only operated the Exxon station for one month, and that gross profits received therefrom were his wife's income.  This testimony lacks credibility.  Additionally, the Debtor testified that he had not yet filed his 2004 tax return when he filed for bankruptcy, so the 2004 and 2005 income stated in the Statement of Financial Affairs were estimates based upon his 2003 figures.  Nevertheless, the Debtor has never amended his Statement of Financial Affairs to reflect the correct information.

As stated, the Debtor amended several of his schedules on June 6, 2006, more than a year after he filed his initial schedules on May 5, 2005, including Schedules A, B, D, E, and G.  *See*

22

COLL. TRIAL EX. 24.  He did not, however, amend his Statement of Financial Affairs, which contains many of the complained of omissions.  Further, the Debtor amended Schedule D to reflect a mortgage in the amount of $100,000.00 with First National Bank on the Rental Property, and he amended Schedule E, which previously showed that the Debtor did not owe any taxes, to evidence that he actually owes back taxes from 2002 through 2005 in the amount of $50,000.00, which are significant omissions from his original schedules.

The fact that the Debtor amended his schedules more than a year after his initial bankruptcy filing raises serious questions with respect to the Debtor's veracity in his initial filings.  Moreover, it appears that he only amended his schedules once the Plaintiff began raising these issues in this adversary proceeding.  And, even though the Debtor filed amendments to his various schedules, these amendments are not complete, in that the Debtor still failed to disclose material information such as the value of his household furnishings, his interest in the Babb's 66 service station, and the debt owed to Mr. Jeffers.  Finally, and significantly, the Debtor never amended his Statement of Financial Affairs to disclose the majority of the information that the Plaintiff proved was not disclosed by the Debtor.

At trial, the Debtor testified that, at the time he originally filed his bankruptcy case, he was simply unaware of his ownership interest in various properties aside from the Babb's 66 previously discussed, including the Sulphur Creek rental property that he owns with Bruce and Holly Babb and vehicles that he co-owns with Patriot Transfer, LLC.  The Debtor testified that he never read anything presented to him for his signature at First National Bank, that either someone from the Bank or Bruce Babb would call and ask him to sign documents.  He also testified that he has never

23

been involved with Patriot Transfer, LLC, which is a company owned by his son, but he acknowledged that he sometimes signed papers at the Bank for Bruce Babb and Patriot Transfer, LLC.

While the Debtor's testimony with respect to his *modus operandi* concerning his dealings with First National Bank and Bruce Babb may be a correct statement of the way he conducted business, the fact remains that his failure to question what he was signing at any time evidences a reckless disregard or indifference for the truth, which was then transferred over into the same with respect to his bankruptcy statements and schedules. *See, e.g., Harvey v. Copeland (In re Copeland)*, 291 B.R. 740, 789 (Bankr. E.D. Tenn. 2003) (finding the failure to read documents before signing them rises to a level of "gross recklessness"). This reckless disregard, when taken in conjunction with the material omissions that he never corrected along with those omissions that he corrected only after the issues were raised by the Plaintiff in this adversary proceeding, sufficiently provides the basis for denying the Debtor's discharge under § 727(a)(4)(A). The Plaintiff has met her burden of proof that the Debtor made false statements with an intent to deceive, such that he is not entitled to a discharge.

### III

In summary, the court finds that the Debtor transferred or concealed property, pre-petition and post-petition, with an intent to hinder, delay, or defraud his creditors and that the Debtor, with fraudulent intent or reckless indifference, made false oaths in the form of misstatements and glaring

24

omissions in his statements and schedules.  Based upon these findings, the court finds that the

Debtor's discharge must be denied pursuant to 11 U.S.C.A. § 727(a)(2)(A), (B), and (4)(A).[5]

A judgment consistent with this Memorandum will be entered.

FILED:  December 19, 2006

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE

---

[5] Because the Debtor is denied his discharge, the Plaintiff's request for a nondischargeable judgment under § 523(a)(2)(A) and/or (6) is moot.